WILLINGHAM *v.* JORDAN.

Opinion delivered May 6, 1905.

1. COMPROMISE—BINDING EFFECT.—Where parties deal with each other upon terms of equality, and the means of information are open to both parties alike, a compromise of a disputed claim will not be set aside, even if the court should be of opinion that the party complaining surrendered rights that the law, if appealed to, would have sustained. (Page 271.)

2. MISTAKE—SUFFICIENCY OF PROOF.—Before a written instrument will be set aside for a mutual mistake, the mutuality of the mistake must be established by the clearest and most satisfactory evidence. (Page 272.)

Appeal from Jefferson Chancery Court.

JOHN M. ELLIOTT, Chancellor.

Reversed.

*N. T. White* and *Ben J. Altheimer,* for appellant.

The quitclaim deed from appellant only conveyed the title held by him. 44 Ark. 160. And was notice of all imperfections of title. 13 Ark. 298, 741; 3 How. 410; 34 Ark. 590; 44 Ark. 154; 12 Pet. 199; 137 U. S. 78; 132 U. S. 318; 137 U. S. 565; 69

Tex. 271; 15 Ark. 275. Failure of title conveyed by quitclaim deed, in the absence of fraud, is no defence to the payment of the purchase money. 15 Ark. 465; 21 Ark. 585. The consideration for the agreement was based on the composition of crime, and the agreement was void. 29 Ark. 336; 32 Ark. 619; 34 Ark. 762; 47 Ark. 378. There was no such mistake as would warrant a court of chancery in setting aside the conveyances. 20 Am. & Eng. Enc. Law, 813; 47 Ark. 335; 27 Ark. 244; 46 Ark. 337. In rescinding a sale, the parties must be placed *in statu quo.* 17 Ark. 603; 33 Ark. 228; 31 Ark. 151; 53 Ark. 16; 59 Ark. 259; 62 Ark. 277; 59 S. W. 520; 60 S. W. 371, 837. Partition does not lie. 27 Ark. 77; 40 Ark. 155; 56 Ark. 391.

*A. T. Whitelaw,* for appellee.

The settlement agreed upon was induced by fraud on the part of the appellant, and the same was void. 35 Ark. 483; 30 Ark. 535; 33 Ark. 334; 47 Ark. 148. There was a mutual mistake, and the conveyance will be rescinded. 29 Ark. 323; 67 Ark. 426; 40 Ark. 352; 66 Ark. 448; 69 Ark. 406; 49 Ark. 34; 27 Ark. 512; 46 Ark. 131; 51 Ark. 434; 52 Ark. 65; 55 Ark. 115; 62 Ark. 99; 67 Ark. 551; 65 Ark. 53. Relief will be granted, although the parties cannot be placed *in statu quo.* 26 Ark. 378; 33 Ark. 425; 47 Ark. 148. Partition of the lands is proper in this cause. 56 Ark. 398; 33 Ia. 487; 105 U. S. 189; 56 Ark. 399; 43 Ill. 282; 68 Ark. 495. Evidence is not admissible in behalf of a party that disputes an admission in his pleading. 32 Ark. 470; 33 Ark. 307. Questions not raised by the pleadings are not considered on appeal. 69 Ark. 23; 64 Ark. 252; 46 Ark. 103; 71 Ark. 552; 70 Ark. 197; 66 Ark. 219.

HILL., C. J. Jerry Willingham was a slave, living in Kentucky, and contracted a slave marriage with another slave, named Celia. The appellees, Jerry and Alex Jordan, are children of that marriage.

Jerry and Celia were separated by Jerry's sale, and he was brought South, and Celia died a few years afterwards. Charlotte Lockridge was also a slave in Kentucky, and was sold and brought South. She and Jerry contracted an alliance—whether

sanctioned by marital rites is uncertain. The appellant, Henry Willingham, is a son of that alliance.

A few years after the war Jerry acquired three adjoining forty-acre tracts of land in what was then Arkansas County, now a part of Jefferson County. He lived on this land something like twenty years, and it seems he acquired it from one Thompson about 1867, and paid him $1,100, and there was at that time a small balance of purchase money unpaid. Jerry improved this land, especially the middle forty, and had about sixty acres under fence, and had some part of each forty in cultivation and in actual possession. He was inclined to be a polygamist, and had two wives, if such they may be called, living with him on this property, and there is some evidence that for a time there was a third. At any rate he had two families there, Charlotte, the mother of one, and Lou Palmer, the mother of the other, and his family left back in Kentucky in addition. He brought part of his Kentucky family to Arkansas, and always recognized these appellees as his children. In fact, he was not sparing in recognition of his several families. These facts are gleaned from the testimony of negro witnesses, whose memory of dates and sequence of events are uncertain, and this statement is only thought to be approximately correct, and is only important as showing that there was a substantial basis for each set of children to allege illegitimacy of the other, one on account of the invalidity of the slave marriage with Celia in Kentucky, and the other on account of the doubt of any marriage with Charlotte. Jerry Willingham went out of possession of the land about 1887. It is claimed by one witness that he was dispossessed of the middle forty by Miss Loudan under a foreclosure decree, and claimed by others that he turned over the middle forty to Capt. Loudan (brother of Miss Loudan) to work out a debt, and claimed by others that all three forties were turned over to one Spellman to work out a debt, and still others that the north and south forties were turned over to Spellman for said purpose. At any rate, he went out of possession, and remained out till his death, three years thereafter. Shortly after his death Henry Willingham and his sister went into possession. The sister afterwards died, and Henry seemed to have entire control thereafter.

On February 16, 1892, Captain Loudan got Henry Willing-
ham to sign a paper acknowledging his "unlawful, unauthorized
and illegal" taking possession of the middle forty, and, in con-
sideration of Henry obliging himself to peacefully relinquish
possession and agreeing not to re-enter or interfere with Miss
Loudan's possession, Miss Loudan agreed not to prosecute Henry
for his "unlawful, unauthorized and illegal act of taking pos-
session of said premises by him or to enforce the claim for heavy
damages sustained by her by said unwarranted act." Nothwith-
standing this agreement, Henry remained peacefully in posses-
sion until he conveyed this forty to appellees in pursuance of the
compromise hereinafter referred to in October, 1897. In August,
1897, Jerry and Alex. Jordan brought suit against Henry for the
land in controversy, alleging that they were "the only living, sole,
and legal heirs of Jerry Willingham, their father, who died Octo-
ber 22, 1890, seized in fee of the above-described land," and
alleged that Henry had been in the unlawful possession of it for
six years, and they prayed for possession and $600 for damages
for its unlawful detention. Henry answered this suit, denying
that the plaintiffs therein (appellees herein) were heirs at law
of Jerry Willingham, and asserted title himself as the child and
only heir at law to Jerry Willingham. In October of that year
the parties to said suit compromised it. Henry received the two
end forties, and Jerry and Alex. the middle forty (where the chief
improvements were), and they respectively deeded to each other,
and the suit was dismissed. Jerry and Alex. went into possession
of the middle forty, and Henry remained in possession of the
other two forties.

A few months after this Captain Loudan appeared on the
scene, and asserted title to the middle forty in behalf of his sister,
and he induced Jerry and Alex. to purchase it of her for $955.
Thereafter Jerry and Alex. brought this suit against Henry, seek-
ing a cancellation of the compromise deeds and a partition of
the land which Henry held, on the ground that the compromise
had been entered into under a mutual mistake as to the title of
the middle forty being in their father, and that the title to it
was not in him but in Miss Loudan. The chancellor found there
was a mutual mistake in said regard, cancelled the deeds, and
partitioned the two end forties equally between Jerry, Alex. and

Henry, and Henry has appealed. Miss Loudan's title is as follows: From the United States through the State to T. J. Thompson; the administrator of Thompson conveyed to Halliburton, and Thompson's widow conveyed her dower interest to Halliburton; then in a suit of "Edward Visert as assignee of W. H. Halliburton *v.* Jerry Willingham," where a judgment for $575 was rendered and the equity of redemption was barred, a commissioner conveyed to Miss Loudan. This was in 1886, and in the same year Visert acquired a tax deed, and he subsequently conveyed by quitclaim to Miss Loudan. As to the tax deed, it was shown to have been based on a forfeiture for a year in which Jerry paid the taxes and had a tax receipt. And under section 5061, Kirby's Digest, no action could have been maintained on it at the time this title was asserted in 1898, if the tax title was ever asserted.

There is no showing as to what assignment Halliburton could have made to Visert to entitle him to bring suit against Jerry Willingham. It appears that Thompson's title was conveyed directly to Halliburton, and it also appears that Jerry had been in possession for twenty years under a purchase from Thompson, Halliburton's predecessor in title. Very likely Jerry's contract of purchase inured to Halliburton, and it was for a foreclosure for balance of the purchase money that the suit was brought, but such is not shown in the record. Conceding, however, a valid paper title in Miss Loudan, her title was dated in 1886, and it would depend upon either proving that she, and not Spellman, took the possession from Jerry, or that the written agreement with Jerry was an acknowledgment of title sufficient to estop him from claiming against her. As heretofore indicated, the testimony is very uncertain as to whether Captain Loudan or Spellman had possession. The paper signed by Henry, if valid, would not extend beyond himself, and would not have affected the other heirs of Jerry; but the paper shows on its face to have been an intimidatory instrument, and was evidently not relied upon, for Henry was left in peaceful possession for five years after its execution. Thus it is seen that it is a doubtful question whether Miss Loudan could have succeeded in dispossessing Jerry and Alex. if they had resisted her title, instead of

acquiescing therein and purchasing it. As to the mutual mistake: Both Jerry and Alex. assert that they understood their father's title was good; that Henry assured them it was, and that they supposed Henry knew, as he had been there all the time. Henry admits that he represented the title was good, and he still insists that it was, and says that he advised them not to surrender to Captain Loudan, and that he told them "they ought to fight it through." He further claims that he fully advised them of Loudan's claim before the compromise, and of the paper he signed, and also that Spellman asserted a claim to the two forties he had in the compromise.

This is denied by Alex. and Jerry, but Jerry testified in one of his depositions as follows: That he knew his father had been off the place at least three years before his death, and that he never inquired as to who was claiming the place; that his father had told him that he was going to see Major White (his attorney), and try to get it back, and that he gave his father $300 or $400 for that purpose; that his father told him that two or three were working to get the place, and that Spellman had it in charge. "Then you knew at the time of the death of your father that this place was in a wrangle?" "Kind o' in a wrangle; yes, sir." "Spellman was claiming it, and others, wer'n't they?" "I don't know who the others were." It is apparent that this evidence is insufficient to set aside the compromise on the ground of a mutual mistake. If Henry's testimony is believed, there was a full understanding on both sides of the chances they were taking with the titles to the respective tracts; and while Alex. and Jerry contradict this, yet they knew too much to claim a mistake or a fraud on them in accepting this middle forty in settlement of their very doubtful rights to any of the land. They knew their father lost the land in some way, and that third parties were in possession when he died, and that several parties were claiming it. When they brought suit against Henry, they employed a lawyer, and were advised of their rights, and the titles to the tracts were as open to their research as to Henry's.

The Supreme Court of the United States said: "It is the case of the compromise of a disputed claim, the parties dealing with each other upon terms of perfect equality, holding no

relations of trust or confidence to each other, and each having knowledge, or having the opportunity to acquire knowledge, of every fact bearing upon the question of the validity of their respective claims. *Cleveland* v. *Richardson,* 132 U. S. 318, 329. Such a settlement ought not to be overthrown, even if the court should be of the opinion that the party complaining had surrendered rights that the law, if appealed to, would have sustained." *Hennessy* v. *Bacon,* 137 U. S. 78.

Chief Justice Cockrill, speaking for this court, said: "It is true that when the means of information are open to both parties alike, so that, with ordinary prudence and vigilance, each may be informed of the facts and rely upon his judgment in regard to the thing to be performed or the subject-matter of the contract, if either fails to avail himself of his opportunities, he will not be heard to say he has been deceived. A court of equity will not undertake to relieve a party from the consequences of his own inattention and carelessness." *Gammill* v. *Johnson,* 47 Ark. 335.

There is another ground equally fatal to appellees. Before equity will afford relief for a mutual mistake, the fact that the mistake was common to both parties must be clearly proved. When a written instrument is to be overcome for mutual mistake, it is required that the mutuality of the mistake be established by the clearest and most satisfactory evidence. *Carnall* v. *Wilson,* 14 Ark. 482; *Rector* v. *Collins,* 46 Ark. 167; *McGuigan* v. *Gaines,* 71 Ark. 614; *Fuller* v. *Hawkins,* 60 Ark. 304; *Goerke* v. *Rodgers, ante,* p. 72.

The evidence of Jerry and Alex. is put against that of Henry. All are equally interested and equally ignorant of the legal effect of their acts. It cannot be said that their evidence in opposition to that of Henry clearly establishes the mutuality of the mistake in the title. Especially is this true in view of the admission of too much knowledge by them of the claims against their father's title.

On the whole case, the court is of the opinion that the appellees failed to establish a right to equitable relief. The judg-

ment is reversed, and the cause remanded with directions to dismiss the complaint.

WOOD, J., and RIDDICK, J., dissent.