## FENDER *v.* HELTERBRANDT.

### Opinion delivered December 18, 1911.

1. COMPROMISE—VALIDITY.—The compromise of a disputed claim is a sufficient consideration to support an express promise, although there may have been no merit or foundation for such claim. (Page 344.)

2. SAME—EFFECT OF MISTAKE.—Compromises will not be disturbed for any ordinary mistake, either of law or fact, in the absence of conduct otherwise inequitable, since their very object is to settle all such possible errors without a judicial controversy. (Page 345.)

Appeal from Lawrence Chancery Court; *George T. Humphries,* Chancellor; affirmed.

*W. A. Cunningham* and *T. W. Campbell,* for appellant.

1. The testimony of Joe Helterbrandt that his mother had $1,200 in money at the time she married Rasdon and that he appropriated to his own use is so unreasonable and improbable, and is contradicted by competent testimony to the effect that she had at the time only a small amount of personal property, that his testimony can not be taken as true. But, even if it were true, the common law with reference to marital rights was in force at the time of her marriage to Rasdon, and her personal property and money at marriage became the absolute property of Rasdon. 29 Ark. 446; 30 Ark. 86; *Id.* 126.

2. The proof is conclusive that John Rasdon was a dull, ignorant, inexperienced man, easily influenced, and that he had confidence in Helterbrandt's truthfulness and integrity. The evidence also shows that Helterbrandt never had any valid claim, and if he had had it was long since barred. Undoubtedly he and his attorney made Rasdon believe that he had a large and valid claim against him. The proof of fraud is conclusive, and it is the special province of chancery to set aside contracts procured under such circumstances as are disclosed here. 68 Ark. 495; 69 Ark. 412; 74 Ark. 239.

3.   The release of a void claim can not become a valid consideration for a note.   21 Am. St. Rep. 888; 39 Am. St. Rep. 745; 9 Cyc. 325.

*John W. & Jos. M. Stayton*, for appellee.

1.   The evidence falls far short of establishing mental incapacity or fraud and overreaching on the part of appellee, and the chancellor's finding that John Rasdon was of sufficient mental capacity to contract must be sustained.

2.   The court's conclusion of law upon the facts is correct. (a)   Duress by threats, to render a contract void, must be such as to excite fear of some grievous wrong.   18 Ark. 214; 26 Ark. 280; 49 Ark. 70; 62 Ark. 625.   (b)   Where the means of information are open to both parties alike, equity will not relieve from the consequences of the inattention or carelessness of either in relying upon the representations of the other. 47 Ark. 335; 75 Ark. 266; 135 U. S. 78.   (c)   The parties having compromised their differences, the court will uphold such compromise.   A compromise of a doubtful or disputed claim is a sufficient consideration for a note given for a sum agreed to be paid by the terms of the compromise.   21 Ark. 75; 29 Ark. 133; 31 Ark. 222; 44 Ark. 558; 68 Ark. 82; 5 Pet. 99; 54 Am. Rep. 157.   The compromise of a disputed claim is  sufficient consideration to support an express promise, although there may have been no merit or foundation for such claim.   43 Ark. 177; 74 Ark. 270; 75 Ark. 272; 36 Ia. 87; 1 Wharton, Ev. § 533; 154 Mass. 450; 122 S. W. 776; 1 Chitty. on Contracts, 46 subsec. 4; *Id.* 29, 47, 49; 45 Am. Rep. 621.

Compromises of family controversies, if reasonable, are especially favored, both in law and equity, and the termination of such controversies is regarded as a valid consideration for the agreement.   62 S. W. 195; 49 S. W. 415; 47 L. R. A 417; 91 Am. Dec. 761.

HART, J.   On the 22d of February, 1910, John Rasdon instituted this suit in the chancery court against Joe Helterbrandt to cancel certain notes.   John Rasdon died in May, 1910, and the suit was revived in the name of the administrator of his estate.

Joe Helterbrandt and John Rasdon were stepbrothers. John Rasdon was 29 years old when he died.

The deposition of Joe Helterbrandt was taken in August, 1910, and he testified that he was 51 years old. Joe Helterbrandt's father died during the civil war, and in 1865 his mother married Wiley Rasdon, and they lived together until she died in 1867. Subsequently, Wiley Rasdon married again, and John Rasdon was the fruit of this marriage. After his mother's death, Joe Helterbrandt was taken to the home of an uncle, and lived with him until he reached the age of maturity. Wiley Rasdon died intestate in Randolph County in 1908. After his death, Joe Helterbrandt made a claim against his estate for moneys which he alleged that Wiley Rasdon had received from his (Helterbrandt's) mother. It was in settlement of this claim that the notes in controversy were executed. The notes are four in number, and bear date of February 2, 1910. The first note is for $100 due November 1, 1910; the second for $300 due November 15, 1911; the third for $400 due November 15, 1912, and the fourth for $400 due November 15, 1913. The complaint alleges that these notes are without consideration, and were procured by the false and fraudulent representations of Joe Helterbrandt to John Rasdon. The prayer of the complaint is for a cancellation of the notes.

The defendant, Helterbrandt, filed an answer, in which he denied all the material allegations of the complaint, and alleged that the notes were executed by John Rasdon as a compromise of Helterbrandt's claim against the estate of Wiley Rasdon, the father of John Rasdon. The witness introduced by the plaintiff, who accompanied John Rasdon when the compromise between John Rasdon and Joe Helterbrandt was made and the notes were executed, was W. H. Arnold, and we quote his testimony as given in the abstract of the plaintiff, as follows: "Am 57 years old; knew John Rasdon in his lifetime; know Joe Helterbrandt; know H. L. Ponder and Willis Ponder. About the 1st or 2d of February, me and Rasdon went to Ponder's office. Harry Ponder got around by Rasdon, and asked him if he saw Helterbrandt coming to town, and he said he saw him; we saw him and talked with him. Harry Ponder asked him if he said anything to him about this matter of the estate, ever talked anything to him about it; John Rasdon told him he hadn't. They talked a right smart about it; Harry asked him how much money his father left him, and he told

him about $1,200 that he got; he asked John Rasdon if it was not a fact that he told him and other parties that he had money buried, and Johnny said he had not told him about having money buried. Harry then asked him if it was not a fact that his father had told him that he had $1,200, and that he intended for Joe Helterbrandt to have it? Johnny said he never said anything to him about it, that he never heard him speak anything about Helterbrandt's estate, or that he owed Helterbrandt. Harry asked Willis Ponder about what time it was before he died that he told these parties that he owed $1,200 to Joe Helterbrandt? Willis Ponder said about two months. Johnny says they must be mistaken, for we were right by him. Johnny asked where these parties were. I know I never heard of Johnny's father owing a dollar to anybody that he didn't pay, and I've known Johnny ever since I saw him running along behind his father's plow picking up grub worms. As we went home, we drove up to Helterbrandt's barn lot, and Johnny asked Joe what he wanted to see him about. Joe and Willis Ponder came out to the fence, and Johnny and those two talked a good little bit. Joe asked Johnny if he did not remember about his father using his mother's estate, and Johnny said he didn't.

"Ponder said he was a lawyer, made his living pleading the law, and that he would advise him, as everything was like it was, to come to some agreement without going into a lawsuit; that not many lawyers would advise a man that way, but he would rather do it than to get up a lawsuit.

"Johnny told Helterbrandt if he knew his father used his mother's money he would be willing to pay it, and asked if he couldn't do that next week; says when I have investigated and see it is justly due you I will give you the notes. Ponder told him that they must come to some agreement there, or they were going to enter suit. He then drew up the notes, and Johnny signed them. Joe Helterbrandt and John Rasdon are stepbrothers, and have always been on good terms so far as I know.

"Johnny was not the brightest man in the world. He was just a good easy turned fellow. He had been attending to his own affairs a little over a year. His father always looked after his business, even rented his place for him. He moved down into one room of his father's house with his wife and child, and

kept them there, never lived on his home place but about two months. His father said he would bring him back home and see after him.

Joe Helterbrandt told Johnny that he knew that his mother had some money and about $600 worth of personal property, but that he would take $1,200 in notes for it, and give him four years' time to pay, and said: 'Now, if you happen to have bad luck and don't make a good crop and want to borrow any money, I'll handle the loan for you; I'll loan you the money to pay either of these notes off when they come due, but don't give a mortgage on the land to anybody else. I'll take a mortgage on the land, and let you have the money.' This was after the notes were given.

"Was anything said by either of the attorneys for Helterbrandt about the result of a suit if it should be brought?

"Yes, sir; Willis Ponder said that Johnny had better make a good compromise than to have a bad lawsuit; that it would ruin him, might lose his home if he went into a lawsuit. Rasdon didn't know anything about law, didn't even know what an attorney at law was.

### CROSS EXAMINATION BY MR. PONDER.

"I remember that Ponder said that he did not know the amount, and that they would have to go to Helterbrandt's house and go over the matter. When we got out there, we saw Willis Ponder and Joe Helterbrandt, and Johnny called to Joe and asked him what he wanted. Joe and Willis Ponder came out to the wagon.

"I think it was after Rasdon said that he could not come back to town the next Saturday that it was suggested that he meet Helterbrandt at his home. Willis Ponder and Joe Helterbrandt did the talking there. Willis Ponder said they had to come to some agreement. Johnny said: 'Give me until next week to see about the thing, and if it is justly due you I'll give my notes with security next week.' And Willis said he had to do something right now or he would have to bring suit. Joe said he had waited long enough, had to see about the estate and get it.

"Rasdon asked Joe who the witnesses were who had heard his father say that he owed him $1,200, and Joe did not tell him. Joe did not tell Rasdon that Wiley Rasdon had stated

to Helterbrandt himself that he owed it. Rasdon had some sense, enough to get along with, but he had never been around much, didn't know anything about law."

The aunt of John Rasdon said that, although he had been married four or five years, his father looked after him until his death. Mrs. John Rasdon testified:

"I was present when a conversation was had between my husband and Joe Helterbrandt on the 1st of February, 1910, in regard to Helterbrandt wanting him to come to Walnut Ridge to see Ponder about a certain matter. The conversation was on Joe's place. We were coming from town, and he holloed at John, and we stopped, and he came to the buggy, and told John that Harry Ponder wanted to see him. John asked him what it was about, and he said he didn't have any idea, but that it might be to his interest to see him. My husband came to Walnut Ridge the next day to see Ponder. Uncle Billy Arnold came with him. That is the only conversation that they ever had when I was along. We met him that morning, he was hauling lumber, but there was no conversation between them then. I am the only wife John Rasdon had after his father's death; his first wife died twelve days before his father died. I attended to most of my husband's business affairs. He wouldn't transact any business without I was with him. He was 29 years old.

### CROSS EXAMINATION BY PONDER.

"I reckon he had good sense, as far as that is concerned. He had never talked with me about the Helterbrandt matter until after Helterbrandt stopped him and talked about it."

James McClusky testified: "I was at Joe Helterbrandt's when the notes in controversy were executed; and was near enough to the parties to hear a little of their conversation. Helterbrandt said that he did not want to do anything but what was fair about it. John Rasdon said he did not. He said something about coming back in three or four days and fixing it up. Joe Helterbrandt said he was satisfied with the settlement, and why not give notes that day. I never paid any more attention to it."

John McClusky testified: "I live on Joe Helterbrandt's place, and am on good terms with him. I was at Joe Helter-

brandt's when the notes were executed. I did not hear any of the conversation after the notes were executed. Helterbrandt said in my presence that he insisted on Rasdon giving the notes then. He said that he wanted the business done up that day while there was a lawyer there. That it would save time and decide it."

Other witnesses for the plaintiff testified that they knew the mother of Joe Helterbrandt at the time she married Wiley Rasdon, and that she did not have any property but two or three head of cattle and a horse or two. They said that John Rasdon was a good easy-going fellow, and that they did not think he was up to the average in general intelligence for a person in his condition. They said that they had never heard of the claim of Joe Helterbrandt against his stepfather until this controversy came up.

T. H. Potter, for the defendant, testified: "Joe Helterbrandt is my sister's child. At the time she married Wiley Rasdon she had two horses, two yoke of oxen, six or seven head of milk cows and some yearlings, about 20 head in all and some 25 or 30 head of hogs. She had some money: I don't know how much. It was in gold and silver. She kept it buried, her and my father both. I don't know how much she had."

Joe Helterbrandt, the defendant, testified: "Am a farmer, 51 years old, live in Eastern District of Lawrence County; I can't read or write. When my mother married Wiley Rasdon, she had two head of horses, four yoke of cattle, seven or eight head of cattle, maybe ten, don't remember, had a few cows and yearlings, cows and yearlings up to about 15 or 20 head, best I can remember. She had a right smart little bunch at that time."

"You say four yoke of oxen or four oxen?"

"Four head."

"What did she have in the way of money?"

"She had something like $1,200—a few dollars over. I saw her count it time and time again."

"Did she and Wiley Rasdon have some place to bury it?"

"We lived in Lawrence County where they married; they kept it buried under the house under the flat iron, buried in a hole there together; they stayed there about a year, and from

there to the Bode farm, and there where they kept it; and then from there to the Bard James place, right near the place she lived there and right behind the house in a hole where something had been pulled up. Kept it covered up there, buried, and after mother died, four or five days after that, he came and dug this money up. Wiley Rasdon dug it up, and I stood by as he counted it. There was a few dollars over $1,200.

We quote from his testimony as follows: "Q. The day the matter was agreed, the compromise, the settlement of the matter, you agreed to knock off the personal property and interest? A. Yes sir. Q. You heard the testimony of Billie Arnold? A. Yes sir. Q. You heard what he said in regard to John wanting to leave and not close up that day, and that you all insisted him staying and fixing it up and not getting where he could advise with any one? A. No words of that sort passed, and there was nothing said at any time. Q. You heard his testimony in regard to Willis Ponder being out to the wagon and making certain statements to him about lawsuits, what about that? A. I heard Billy Arnold make that statement, and there is not a word of it true. Willis Ponder never opened his mouth until he was called on to write the notes. Q. You heard the statements of Billy Arnold about your saying that you had all that land behind you there, and that you would law it out with him? A. I heard him make that statement. I never made that statement there at all. This is my first lawsuit; never had anything of the sort before to bother me.

"After my mother's death I went to live with my mother's brother, and never lived with my stepfather any more. My stepfather got the oxen, cattle, hogs, and the money my mother had at the time of her death."

Harry Ponder testified: "John Rasdon and Arnold came to my office in the early part of this year. They both asked, I believe, what I wanted with them, and I didn't know at the time. He said Helterbrandt had seen him out on the road. I told him that I had never talked to Helterbrandt, and didn't know the details. He said he would like to know the details; would like to know how much Helterbrandt claimed his father owed him. I asked him to wait in town until we could send for Helterbrandt. He said he had to go home. I asked him when he would be back. He said: 'Maybe a week or two weeks.'

I suggested that one of us go to Helterbrandt's, and when he came there to stop, and we would have a meeting there.    I had to go to Black Rock, and W. M. Ponder, my partner, drove out there.    The only thing I said to him was that it would be best for him and Helterbrandt to get together and settle, compromise; that it would be best for both; that litigation was not a very good thing sometimes; it was a little expensive.    He agreed to that, too."

Willis Ponder testified:    "The statement made as to what transpired in our office the morning these parties were there was as here stated by H. L. Ponder.    John Rasdon and Arnold arrived at Helterbrandt's a few minutes after I got there. After Helterbrandt and Rasdon had discussed the claim awhile, Rasdon asked Helterbrandt how much it amounted to, and the latter said $1,200 in money that Wiley Rasdon had gotten from his mother and $400 or $500 in stock.    After they had talked about it awhile longer, Helterbrandt told Rasdon that they had talked the matter over before.    Rasdon then asked him if his father did not pay him $1,200 not long before he died, and Helterbrandt answered that he had not paid him anything. Rasdon then said there was about $1,200 that he could not account for.    Helterbrandt told him that he wanted the matter settled; that it had been running a good many years while the old man lived; that he wanted it settled without a lawsuit if they could do it; but, if they could not, he would bring suit and let the court decide it for them.    Rasdon said that he did not want any lawsuit, and that he knew Helterbrandt would do what was right about it.    He then asked Helterbrandt how much he wanted, and the latter replied that he would release all claim against Wiley Rasdon's estate for $1,200.    Rasdon and Arnold then talked the matter over, and Arnold advised a settlement.    Rasdon said that he did not have any money then, and Helterbrandt told him that he would give him all the time he wanted.    I first wrote out the notes with a clause in them that if the notes were not paid at maturity all of the notes should become due and payable.    Rasdon, after reading the notes, objected to this clause, and I then prepared the notes in the form in which they were executed.    Rasdon signed all the notes, and that was about all that was said about it.    I did not volunteer to make any statement.    They called me to

write the notes, and the statement that I told him that I was a lawyer and made a living by practicing law, and that very few lawyers, if any, would advise him to compromise, is absolutely untrue. Mr. Arnold was the man who advised with him as to the compromise, and they agreed there that by giving these notes Helterbrandt would release his claim for stock and interest and take a receipt for the $1,200. There was no statement made there or in our office to the effect that if Rasdon did not settle we would bring suit and break him up. Helterbrandt did tell him that he had waited as long as he wanted to, and that if the matter was not settled he would bring suit. The testimony of Arnold to the effect that Rasdon wanted time to go home and to consult an attorney before he made the settlement is not true.

The chancellor found for the defendant, and the complaint was dismissed for want of equity. The plaintiff has appealed.

The testimony shows that John Rasdon was a slow, easy-going fellow, and that he could be easily persuaded into doing anything, but it falls short of establishing the fact that he did not have sufficient mental capacity to make the settlement in question. There was no relation of trust and confidence between John Rasdon and Joe Helterbrandt, and they dealt at arms' length with each other. The testimony of the defendant and of Willis Ponder shows that John Rasdon was not induced to make the settlement by reason of any false representations made to him. Their testimony also shows that Rasdon did not make the settlement under duress. They said that he made the settlement voluntarily after consultation with Arnold, whom he brought with him. It is true that Helterbrandt said that he would bring suit if the matter was not settled, but this he had a right to do. Their testimony in these respects is not contradicted except by Arnold, and it can not be said that the finding of the chancellor in favor of the defendant was against the clear preponderance of the evidence.

It is not necessary to express an opinion as to whether John Rasdon surrendered rights that the law, if appealed to, would have sustained; for the compromise of a disputed claim is a sufficient consideration to support an express promise, although there may have been no merit or foundation for such

claim. *Mason* v. *Wilson,* 43 Ark. 172; *Satchfield* v. *Laconia Levee District,* 74 Ark. 270.

Referring to this class of compromises, we find the rule in equity to be that such settlements "will not be disturbed for any ordinary mistake, either of law or of fact, in the absence of conduct otherwise inequitable, since their very object is to settle all such possible errors without a judicial controversy." 2 Pomeroy's Eq. Jur. § 850; *Willingham* v. *Jordan,* 75 Ark. 266. As above stated, the parties to the settlement under consideration held no relation of trust and confidence to each other, and dealt upon terms of equality. They each had an opportunity to investigate, and to rely upon his own judgment in regard to the subject-matter of the settlement. At least, the chancellor so found, and we can not say that his finding is against the clear preponderance of the evidence.

The decree will be affirmed

Mr. Justice KIRBY dissents.